**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

| | |
|---|---|
| ROBERT SCHARF,<br><br>PLAINTIFFS,<br><br>V.<br><br>PHM BRANDS, LLC; JOHN MASON; AND BRYAN LEDGERWOOD,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT and JURY DEMAND** |

Plaintiff, Robert Scharf ("Scharf"), by and through counsel, alleges and states as follows:

## I. PARTIES, JURISDICTION & VENUE

1. Scharf is a resident of Sarpy County, Nebraska.

2. Defendant, PHM Brands, LLC ("PHM"), is a Delaware limited liability company and operates its headquarters out of Denver, Colorado. PHM is engaged in the business of grain production and milling. At all relevant times, PHM Brands also operated an office out of and were engaged in business in Omaha, Nebraska. PHM operates at least nine locations throughout the United States.

3. Defendant, John Mason ("Defendant Mason"), a Co-Founder, Managing Director, and Chief Executive Officer of PHM, is a resident of Denver, Colorado.

4. Defendant, Bryan Ledgerwood ("Defendant Ledgerwood"), a Co-Founder, Managing Director, and Chief Executive Officer of PHM, is a resident of Elk Point, South Dakota.

5. This action arises under the laws of the United States, in particular the Securities Exchange Act of 1934 (as amended) and regulations promulgated thereunder. Specifically, this Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331. The purpose of the federal securities laws, as explained by the United States Supreme Court is to "regulate *investments*, in whatever form they are made and by whatever name they are called." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

6. This Court has personal jurisdiction over the parties pursuant to 15 U.S.C. § 78aa.

7. Venue is proper in this Court pursuant to 15 U.S.C. § 78aa.

8. This Court has supplemental jurisdiction over the additional state law claims pursuant to 28 U.S.C. § 1367(a) as they are so related to claims in the action within the original jurisdiction of the Court that they form part of the same case or controversy under Article III.

## II. GENERAL ALLEGATIONS

9. Beginning in or about November of 2023, Defendant Mason and Defendant Ledgerwood sought further investment into PHM from potential investors, including Scharf.

10. Defendant Mason and Defendant Ledgerwood approached Scharf about him investing $1 million into PHM.

11. Defendant Mason and Defendant Ledgerwood, knowing Scharf resides in Nebraska, reached out to him from locations within the United States on numerous

occasions by email, phone, and Microsoft Teams conferencing to induce him to invest $1 million into PHM.

12. In inducing Scharf to invest $1 million into PHM, Defendant Mason and Defendant Ledgerwood represented that in exchange for the investment funds, Scharf would get a 40% annual cash interest payment on his investment with 10% paid monthly. This representation was false or made with reckless disregard to its truth or falsity.

13. Also, to induce Scharf to invest $1 million into PHM, Defendant Mason and Defendant Ledgerwood misrepresented that in exchange for investment funds, the following would happen:

a. Scharf would have a Board of Directors' seat, with the board to have five or six members with five votes;

b. That the Board of Directors would set financial reporting requirements for PHM operating companies and approve all financing obligations, consistent with Sandton Capital Solutions requirements;

c. That an accounting reconciliation of money flows between entities owned all or in part by the member would be completed and the Board of Directors must approve any future dealing with entities owned all or in part by members;

d. The Board of Directors must review documents with NIPPN as a partner and Utah Milling ownership will be contributed to PHM upon commissioning of the mill per the current agreements;

e. The loan documents between all entities and investors/lenders would be updated to ensure proper records;

f. "All reforms required in the Preferred Notes for Working Capital to stay in place until the Preferred Notes for Working Capital and respective Ledge LLC debt has been repaid in full";

g. "Annual disclosure of all outstanding debt obligations of PHM and all related entities to or from investors and other outside organizations";

h. "Reconciliation of the ~$13 million investment to PHM inclusive of the sources and uses of capital"; and

i. "Managers of PHM agree to negotiate solely on behalf of and for the benefit of PHM (must not have a conflict of interests)".

14. Defendant Mason and Defendant Ledgerwood initially made these misrepresentations to Scharf during multiple phone calls and Microsoft Teams conferences while Scharf was in Nebraska and they were in Colorado or elsewhere within the United States, including on February 11–14, 2024.

15. Defendant Mason and Defendant Ledgerwood misrepresented that investment documents would be prepared.

16. These misrepresentations, and more, were made to Scharf while he was in Nebraska during a call with Defendant Mason and Defendant Ledgerwood on February 12, 2024, and were memorialized in a Preferred Note Term Sheet ("Term Sheet"), dated February 7, 2024, which Defendant Ledgerwood sent by email to Scharf in Nebraska on February 12, 2024.

17. A primary misrepresentation made to Scharf was that he, along with the other three investors, would be elected to PHM's Board of Directors with the authority to make financial decisions for PHM. This misrepresentation was not only detailed in the Term Sheet, but was discussed since the initial investment conversations between Defendants and Scharf and the three other investors. This misrepresentation was made repeatedly.

18. On February 13, 2024, Defendant Mason sent Scharf an email informing him that the Term Sheet had been loaded into DocuSign for his signature. On that same day, Scharf signed the Term Sheet, as did Defendant Ledgerwood on behalf of PHM as its Managing Director and Chief Executive Officer. A true and correct copy of the signed Term Sheet is attached hereto as **Exhibit A** and incorporated herein by this reference.

19. In reliance on the misrepresentations made by Defendant Mason and Defendant Ledgerwood, on February 14, 2024, Scharf transferred $1 million from an account in Nebraska to PHM.

20. The Term Sheet contains misrepresentations that were made to induce Scharf to invest $1 million into PHM, which details the representations made in

exchange for the $1 million invested by Scharf (See Term Sheet; Term Sheet Exhibit A):

a. 40% annual cash interest payment with 10% paid monthly and 30% payment-in-kind.

b. Election of Scharf and the other investors to PHM's Board of Directors.

c. The Board of Directors will have the authority to set financial reporting requirements for PHM Operating Companies and approve all new financing obligations, as consistent with Sandton Capital Solutions requirements.

d. The hiring of a controller with CPA credentials or one deemed acceptable by Sandton Capital Solutions.

e. Authority for the Board of Directors to approve any future dealings with entities owned all or in part by PHM members.

f. Utah Milling ownership will be contributed to PHM upon the commissioning of the mill per the current agreements. The Board must review documents with the NIPPN as a partner.

g. Update loan documents between all entities and investors/lenders to ensure proper records.

h. All reforms required in the Preferred Notes for Working Capital to stay in place until the Preferred Notes for Working Capital and respective Lodge LLC debt has been repaid in full.

i. Annual disclosure of all outstanding debt obligations of PHM and all related entities to or from investors and other outside organizations.

j. Reconciliation of the ~$13 million investment to PHM inclusive of the sources and uses of capital.

k. Managers of PHM agree to negotiate solely on behalf of and for the benefit of PHM (must not have a conflict of interests).

21. As the Term Sheet identifies, the parties agreed that their agreement would be governed by Delaware law.

22. Defendant Mason and Defendant Ledgerwood assured Scharf that the terms of the investment would be finalized after he invested the funds.

23. During the calls and Microsoft Teams meetings, including on February 12, 2024, Defendant Mason and Defendant Ledgerwood represented to Scharf the funds were urgently needed and the investment documents would have to be finalized after Scharf invested the $1 million. During those calls and Microsoft Teams meetings, Defendant Mason and Defendant Ledgerwood told Scharf that failure to immediately transfer the investment funds would put PHM at the risk of bankruptcy.

24. After the Term Sheet was signed, Defendant Mason and Defendant Ledgerwood told Scharf and the other investors that PHM would not be able to make the interest payments obligated by the Term Sheet for an indefinite period of time because such payments were purportedly subordinated and not allowed under PHM's agreement with its primary lender, Sandton Capital Solutions. Defendant Mason and

Defendant Ledgerwood failed to disclose the terms of Sandton Capital Solutions's lending documentation with Scharf. This shows that Defendant Mason and Defendant Ledgerwood knew their representations were false when made or at the very least should have known the same given their positions in PHM, thus showing that they made the statements intending to deceive Scharf or at the very least with such disregard for the truth that fraud should be presumed. By way of example, later after the Term Sheet was signed and Scharf made the $1 Million investment in PHM, Defendant Ledgerwood told Scharf that no interest payments would be made and reiterated that the investment funds were needed "or else" numerous times.

25. Since February 2024, Scharf and his attorney have reached out to PHM on countless occasions seeking to finalize the investment, request the investment documents, and receive other documentation that had been represented would be provided as part of his investment – all to no avail.

26. On October 7, 2024, Scharf, through his attorney, sent a letter to PHM demanding performance of the agreement as detailed in the Term Sheet. PHM did not respond or perform the agreement.

27. On October 9, 2024, Scharf, through his attorney, sent a second letter to PHM demanding performance of the agreement as detailed in the Term Sheet. PHM did not initially respond to Scharf's letters other than to send an email on October 14, 2024 recognizing receipt of Scharf's letters, and to hollowly state they would get back to Scharf. Then on October 18, 2024, PHM, through its attorney, responded by letter purporting to claim that all of the requirements of the Term Sheet had been met

thereby ignoring the reality of the circumstances including the fact that PHM had paid no monthly interest payments.

## III. CLAIMS

### SECURITIES FRAUD UNDER THE SECURITIES EXCHANGE ACT
### (Defendant Mason, Defendant Ledgerwood, and Defendant PHM)

28. Scharf incorporates the forgoing allegations as if fully restated herein.

29. Defendant Mason, Defendant Ledgerwood, and PHM violated the Securities Exchange Act, §10(b) thereof, and Rule 10b-5.

30. Section 10(b) of the Securities Exchange Act prohibits using or employing "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . ." 15 U.S.C. § 78j(b).

31. Rule 10b–5, promulgated under the Securities Exchange Act, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
>
> 17 C.F.R. § 240.10b–5.

32. Scharf's $1 million investment under the Term Sheet constitutes a security pursuant to the Securities Exchange Act.

33. Defendant Mason and Defendant Ledgerwood unlawfully employed a device, scheme, or artifice to defraud Scharf of his $1 million investment. Defendant

Mason and Defendant Ledgerwood utilized the Term Sheet as their device, scheme, or artifice to defraud, to entice and operate a fraud and deceit upon Scharf to get his $1 million investment.

34. Defendant Mason and Defendant Ledgerwood were desperate for investments from Scharf and the other investors, claiming the funds were needed immediately.

35. Defendant Mason and Defendant Ledgerwood acting for and on behalf of PHM unlawfully made untrue statements or omissions of material facts in connection with the sale of a security to Scharf, including but not necessarily limited to the following misrepresentations that they explicitly detailed in the Term Sheet after having told Scharf the same:

a. Falsely stated that Scharf would be entitled to interest payments pursuant to the Term Sheet;

b. Falsely stated that Scharf would have a Board of Directors' seat, with the board to have five or six members with five votes;

c. Falsely stated that the Board of Directors would set financial reporting requirements for PHM operating companies and approve all financing obligations, consistent with Sandton Capital Solutions requirements;

d. Falsely stated that an accounting reconciliation of money flows between entities owned all or in part by the member would be

completed and the Board of Directors would approve any future dealing with entities owned all or in part by members;

e. Falsely stated that the Board of Directors must review documents with NIPPN as a partner and Utah Milling ownership will be contributed to PHM upon commissioning of the mill per the current agreements;

f. Falsely stated that the loan documents between all entities and investors/lenders would be updated to ensure proper records;

g. Falsely stated that all reforms required in the Preferred Notes for Working Capital to stay in place until the Preferred Notes for Working Capital and respective Ledge LLC debt has been repaid in full;

h. Falsely stated that the annual disclosure of all outstanding debt obligations of PHM and all related entities to or from investors and other outside organizations;

i. Falsely stated that reconciliation of the ~$13 million investment to PHM inclusive of the sources and uses of capital; and

j. Falsely stated that managers of PHM agree to negotiate solely on behalf of and for the benefit of PHM (must not have a conflict of interests).

36. The misrepresentations were memorialized in the Term Sheet after the signing of which Scharf invested $1 million into PHM.

37. Defendant Mason and Defendant Ledgerwood as Managing Directors and Chief Executive Officers of PHM in making these fraudulent factual misrepresentations and omissions of material facts engaged in acts, practices, or a course of business which operated or would operate as a fraud or deceit upon Scharf with regard to his $1 million investment in PHM.

38. Defendant Mason and Defendant Ledgerwood acted with scienter, that is, with the intent to deceive or acted with such disregard for the truth that fraud can be presumed.

39. Because Defendant Mason and Defendant Ledgerwood are Co-Founders, Managing Directors, and Chief Executive Officers of PHM, they knew or should have known the financial position and financial obligations of PHM. Defendant Mason and Defendant Ledgerwood knew or should have known based on their executive positions at PHM that PHM would not be capable of carrying out the misrepresentations set out in the Term Sheet.

40. Even if Defendant Mason and Defendant Ledgerwood did not know they were making fraudulent misrepresentations, these misrepresentations, with acknowledgement of their executive positions and control over PHM and PHM's finances, would make these representations a reckless disregard of the truth.

41. Given Defendant Mason and Defendant Ledgerwood positions as Co-Founders, Managing Directors, and Chief Executive Officers of PHM they failed to disclose material facts necessary in order to make the statements they were making

as detailed herein in light of the circumstances under which they were made were not misleading.

42. As the Managing Directors and Chief Executive Officers of PHM, Defendant Mason and Defendant Ledgerwood knew or should have known that their agreement with Sandton Capital Solutions would not allow PHM to pay interest to the investors as detailed in the Term Sheet when they knew and represented that Scharf's, and the other investors', investments were created as a preferred equity investment that included, what Defendant Ledgerwood termed, an extremely appealing interest rate in order to induce Scharf and the other investors into making the investment.

43. As Managing Directors and Chief Executives of PHM, Defendant Mason and Defendant Ledgerwood knew or should have known that they had no intention of electing Scharf and the other three investors to PHM's Board of Directors with the authority set out in PHM's LLC Agreement at the time or as represented in the Term Sheet. This was a particularly compelling proposition (and representation) for the investors, including Scharf. However, Scharf, nor the other investors, were elected to a Board of Directors with the authority to make financial decisions for PHM. When repeatedly asked by Scharf and Scharf's attorney why the new Board had not been elected, Scharf was met with dismissive responses or silence. After seven months of no meaningful replies, possibly sensing the unrest of Scharf and the other investors, Defendant Mason and Defendant Ledgerwood offered to elect Scharf and the other investors to the Board. However, they offered this position only after they executed a

new LLC Agreement for PHM that stripped the Board of Directors of any power or authority to make financial decisions for PHM. These actions show, Defendant Mason's and Defendant Ledgerwood's misrepresentations were false when made or at the very least made with a reckless disregard for the truth, with many misrepresentations going to the Board's power, including:

a. Creating a six member Board of Directors with four $1 million dollar investor outsiders to have four of the five votes.

b. Board of Directors will set financial reporting requirements for PHM Operating Companies and approve all financing obligations, consistent with Santon Capital Solutions Requirements.

c. Approval by Board of Directors of any future dealing with entities owned all or in part by members.

d. Board of Directors review of documents with NIPPN as a partner.

44. As Managing Directors and Chief Executive Officers of PHM, Defendant Mason and Defendant Ledgerwood knew or should have known that the representations they were making to induce Scharf's $1 million investment were false. Further indication of that falsity or reckless disregard for the truth is found in Defendant Mason's and Defendant Ledgerwood's actions in the time since the Term Sheet was executed. Scharf and his attorneys have sent numerous communications to PHM, Defendant Ledgerwood, and Defendant Mason. Scharf and his attorneys have been met with nonresponsive answers or silence. Had Defendant Mason and

Defendant Ledgerwood had any intention to perform and live up to their representations they would have at least attempted to fulfill the obligations and communicate these attempts with Scharf and the other investors. Yet Defendant Mason, Defendant Ledgerwood, and PHM have not:

a. Provided any type of accounting reconciliation of the money flows between entities owned all or in part by the members.

b. Updated loan documents between all entities and investors/lenders to insure proper records.

c. Ensured that all reforms required by the Preferred Notes for Working Capital stay in place until the Preferred Notes for working Capital and respective Ledge LLC debt has been repaid in full.

d. Provided any disclosure, annual or otherwise, of all outstanding debt obligations of PHM and all related entities to or form investors and other outside organizations.

e. Reconciled the approximately $13 million investment to PHM inclusive of the sources and uses of capital.

f. Ensure that managers of PHM agree to negotiation solely on behalf of and for the benefit of PHM, without a conflict of interest.

45. Indeed, in finally responding to Scharf, PHM claimed to have lived up to the representations. Such detachment in the face of Defendant Mason's, Defendant

Ledgerwood's, and PHM's inaction and omissions merely serve to confirm their intent to defraud Scharf.

46. Defendant Mason's and Defendant Ledgerwood's fraudulent misrepresentations and omissions on behalf of PHM induced Scharf to purchase the security, that is to invest his $1 million pursuant to the Term Sheet. But for such representations and the false and fraudulent Term Sheet, Scharf would not have invested his $1 million in PHM.

47. A causal connection exists between Defendant Mason's and Defendant Ledgerwood's fraudulent statements and omissions and Scharf's harm. Scharf would not have lost his $1 million investment but for Defendant Mason's and Defendant Ledgerwood's fraudulent representations and omissions regarding the agreement as detailed in false and fraudulent Term Sheet.

48. Scharf invested in PHM in reliance on Defendant Mason's and Defendant Ledgerwood's fraudulent misrepresentations and omissions of material facts as detailed in the false and fraudulent Term Sheet. Had Defendant Mason and Defendant Ledgerwood not made the false representations and omissions of material facts as detailed in the false and fraudulent Term Sheet, Scharf would not have invested $1 million in PHM.

WHEREFORE, Scharf requests a judgment be entered against Defendant Mason, Defendant Ledgerwood, and PHM, jointly and severally, for all relief allowed by the Securities Exchange Act and the regulations promulgated thereunder but not less than his $1 million investment, interest as allowed by law, pre and post judgment

interest as allowed by law, attorneys fees and costs as allowed by law, and such other relief as the Court deems just and equitable.

**SECURITIES FRAUD UNDER THE SECURITIES ACT OF NEBRASKA**
**(Defendant Mason, Defendant Ledgerwood, and Defendant PHM)**

49. Scharf incorporates the forgoing allegations as if fully restated herein.

50. Nebraska Revised Statute § 8-1102(1) of the Securities Act of Nebraska sets out fraud and other prohibited conduct. Section 8-1102(1) provides:

> (1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:
> (a) To employ any device, scheme, or artifice to defraud;
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

51. Nebraska Revised Statute § 8-1118(1) provides in relevant part:

> Any person who offers or sells a security in violation of section 8-1104 or offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he or she did not know and in the exercise of reasonable care could not have known of the untruth or omission, shall be liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six percent per annum from the date of payment, costs, and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security…

52. The Securities Act of Nebraska is to be construed liberally to afford the greatest possible protection to the public.

53. Scharf's $1 million investment under the Term Sheet constitutes a security pursuant to the Securities Act of Nebraska.

54. Defendant Mason and Defendant Ledgerwood unlawfully employed a device, scheme, or artifice to defraud Scharf of his $1 million investment. Defendant Mason and Defendant Ledgerwood utilized the Term Sheet as their device, scheme, or artifice to defraud, to entice and operate a fraud and deceit upon Scharf to get his $1 million investment.

55. In addition, Defendant Mason and Defendant Ledgerwood unlawfully made untrue statements or omissions of material facts in connection with the sale of a security to Scharf, including but not necessarily limited to the following that they explicitly documented in the Term Sheet after having told Scharf the same:

a. Falsely stated that Scharf would be entitled to interest payments pursuant to the Term Sheet;

b. Falsely stated that Scharf would have a Board of Directors' seat, with the board to have five or six members with five votes;

c. Falsely stated that the Board of Directors would set financial reporting requirements for PHM operating companies and approve all financing obligations, consistent with Sandton Capital Solutions requirements;

d. Falsely stated that an accounting reconciliation of money flows between entities owned all or in part by the member would be

completed and the Board of Directors would approve any future dealing with entities owned all or in part by members;

e. Falsely stated that the Board of Directors must review documents with NIPPN as a partner and Utah Milling ownership will be contributed to PHM upon commissioning of the mill per the current agreements;

f. Falsely stated that the loan documents between all entities and investors/lenders would be updated to ensure proper records;

g. Falsely stated that all reforms required in the Preferred Notes for Working Capital to stay in place until the Preferred Notes for Working Capital and respective Ledge LLC debt has been repaid in full;

h. Falsely stated that the annual disclosure of all outstanding debt obligations of PHM and all related entities to or from investors and other outside organizations;

i. Falsely stated that reconciliation of the ~$13 million investment to PHM inclusive of the sources and uses of capital; and

j. Falsely stated that managers of PHM agree to negotiate solely on behalf of and for the benefit of PHM (must not have a conflict of interests).

56. Defendant Mason and Defendant Ledgerwood as Managing Directors and Chief Executive Officers of PHM in making these fraudulent factual

misrepresentations and omissions of material facts engaged in acts, practices, or a course of business which operated or would operate as a fraud or deceit upon Scharf with regard to his $1 million investment in PHM.

57. Scharf did not know of the untruths or of the omissions.

58. Defendant Mason and Defendant Ledgerwood knew, or in the exercise of reasonable knew or should have known, of the untruths or omissions.

59. Scharf justifiability relied on Defendant Mason's and Defendant Ledgerwood's statements.

60. Scharf was harmed by Defendant Mason's and Defendant Ledgerwood's fraud and deceit because Scharf did not have access to his $1 million investment nor any interest payments as agreed in the Term Sheet.

WHEREFORE, Scharf requests a judgment be entered against Defendant Mason, Defendant Ledgerwood, and PHM, jointly and severally, for all relief allowed by the Securities Act of Nebraska but not less than his $1 million investment, interest as allowed by law, pre and post judgment interest as allowed by law, attorneys fees and costs, and such other relief as the Court deems just and equitable.

**FRAUDULENT MISREPRESENTATION AND FRAUDULENT INDUCEMENT**
**(Defendant Mason and Defendant Ledgerwood)**

61. Scharf incorporates the forgoing allegations as if fully restated herein.

62. Defendant Mason and Defendant Ledgerwood made representations to Scharf to induce Scharf to invest $1 million in PHM, including but not necessarily limited to the following:

a. Falsely stated that Scharf would be entitled to interest payments pursuant to the Term Sheet;

b. Falsely stated that Scharf would have a Board of Directors seat, with the board to have five or six members with five votes;

c. Falsely stated that the Board of Directors would set financial reporting requirements for PHM operating companies and approve all financing obligations, consistent with Sandton Capital Solutions requirements;

d. Falsely stated that an accounting reconciliation of money flows between entities owned all or in part by the member would be completed and the Board of Directors would approve any future dealing with entities owned all or in part by members;

e. Falsely stated that the Board of Directors must review documents with NIPPN as a partner and Utah Milling ownership will be contributed to PHM upon commissioning of the mill per the current agreements;

f. Falsely stated that the loan documents between all entities and investors/lenders would be updated to ensure proper records;

g. Falsely stated that all reforms required in the Preferred Notes for Working Capital to stay in place until the Preferred Notes for Working Capital and respective Ledge LLC debt has been repaid in full;

h. Falsely stated that the annual disclosure of all outstanding debt obligations of PHM and all related entities to or from investors and other outside organizations;

i. Falsely stated that reconciliation of the ~$13 million investment to PHM inclusive of the sources and uses of capital; and

j. Falsely stated that managers of PHM agree to negotiate solely on behalf of and for the benefit of PHM (must not have a conflict of interests).

63. Defendant Mason and Defendant Ledgerwood knew the representations were false when making them or were recklessly indifferent to the truth.

64. Defendant Mason and Defendant Ledgerwood fraudulently induced Scharf to make the $1 million investment before the Term Sheet was finally documented by telling Scharf that PHM would have to file for bankruptcy if the funds were not transferred that day.

65. Scharf was justifiably concerned about the financial position of PHM. Scharf relied on the statements of PHM's managers that the need for capital was urgent and necessary for PHM's survival as a business.

66. Scharf relied on the Defendant Mason and Defendant Ledgerwood's false representations in making the $1 million investment.

67. Defendant Mason and Defendant Ledgerwood intended for Scharf to rely on the false statements in order to receive his $1 million investment.

68. Scharf was justified in relying on the false statements made by Defendant Mason and Defendant Ledgerwood.

69. Scharf suffered damages due to his justified reliance on Defendant Mason's and Defendant Ledgerwood's false statements. Scharf has been denied access his $1 million investment and he has not received any interest payments as was represented by Defendant Mason and Defendant Ledgerwood.

WHEREFORE, Scharf requests a judgment against Defendant Mason and Defendant Ledgerwood, jointly and severely, for monetary damages in an amount to be determined at trial but not less than his $1 million investment that was made on the basis of fraudulent misrepresentations and accrued interest he was fraudulently promised, pre and post judgment interest as allowed by law, attorneys fees and costs as allowed by law, and such other and further relief that the Court deems just and equitable.

**NEGLIGENT MISREPRESENTATION**
**(Defendant Mason and Defendant Ledgerwood)**

70. Scharf incorporates the forgoing allegations as if fully restated herein.

71. Defendant Mason and Defendant Ledgerwood, in order to get Scharf to invest $1 million into PHM made the following misrepresentations without using reasonable care:

a. Falsely misrepresented that Scharf would have a Board of Directors seat that would have authority and input on the financial position of PHM, including the authority to set financial reporting requirements for PHM Operating Companies and

approve all new financing obligations, approve any future dealing with entities owned all or in part by members, reconcile the money flows between entities owned all or in part by members, and review documents with NIPPN as a partner;

b. Falsely stated that Scharf would be entitled to interest payments pursuant to the Term Sheet;

c. Falsely stated that Scharf would have a Board of Directors seat, with the board to have five or six members with five votes;

d. Falsely stated that the Board of Directors would set financial reporting requirements for PHM operating companies and approve all financing obligations, consistent with Sandton Capital Solutions requirements;

e. Falsely stated that an accounting reconciliation of money flows between entities owned all or in part by the member would be completed and the Board of Directors would approve any future dealing with entities owned all or in part by members;

f. Falsely stated that the Board of Directors must review documents with NIPPN as a partner and Utah Milling ownership will be contributed to PHM upon commissioning of the mill per the current agreements;

g. Falsely stated that the loan documents between all entities and investors/lenders would be updated to ensure proper records;

h. Falsely stated that all reforms required in the Preferred Notes for Working Capital to stay in place until the Preferred Notes for Working Capital and respective Ledge LLC debt has been repaid in full;

i. Falsely stated that the annual disclosure of all outstanding debt obligations of PHM and all related entities to or from investors and other outside organizations;

j. Falsely stated that reconciliation of the ~$13 million investment to PHM inclusive of the sources and uses of capital; and

k. Falsely stated that managers of PHM agree to negotiate solely on behalf of and for the benefit of PHM (must not have a conflict of interests).

72. Defendant Mason and Defendant Ledgerwood knew that Scharf would be guided by the misrepresentations in relation to his decision to make the $1 million investment. Indeed, Defendant Ledgerwood specifically recognized that the investments under the Term Sheet were created with an extremely appealing interest rate to induce the investors, including Scharf, to each invest $1 million in PHM.

73. Defendant Mason's and Defendant Ledgerwood's misrepresentations caused Scharf the loss of his $1 million investment and the related interest he was promised thereon.

74. Scharf justifiably relied upon the information provided by Defendant Mason and Defendant Ledgerwood.

75. Defendant Mason and Defendant Ledgerwood failed to exercise reasonable care or competence in supplying the information.

76. Scharf suffered a pecuniary loss of $1 million and unpaid interest caused by his reliance on Defendants Mason's and Defendant Ledgerwood's false statements.

WHEREFORE, Scharf requests judgment against Defendant Mason and Defendant Ledgerwood, jointly and severally, for monetary damages to be proven at trial but not less than his $1 million investment and accrued interest as represented, pre and post judgment interest as allowed by law, attorneys fees and costs as allowed by law, and for such other and further relief as the Court deems just and equitable.

**BREACH OF CONTRACT**
**(Defendant PHM)**

77. Scharf incorporates the forgoing allegations as if fully restated herein.

78. A contract existed between Scharf and PHM where Scharf agreed to give PHM $1 million in exchange for repayment of the investment, interest payments, and the various obligations from PHM as detailed in the Term Sheet.

79. Under the parties' agreement, Scharf invested $1 million into PHM. Scharf completely performed his duties under the agreement when he invested these funds into PHM on February 14, 2024.

80. PHM has not performed its contractual obligations by failing to make any interest payments on the loan and failing to meet the additional obligations of the agreement as detailed in the Term Sheet.

81. The agreement as detailed in the Term Sheet provides that Scharf is entitled to receive interest payments totaling 40% annual percentage yield, with 10%

paid per month on his $1 million investment and 30% interest paid in kind upon repayment of the loan. Nearly eight months have passed since Scharf invested $1 million pursuant to the agreement. Scharf has not received a single interest payment on his investment, nor have material parts of the agreement's additional obligations be performed by PHM.

82. One obligation required of PHM in the Term Sheet is to appoint a new Board of Directors that is made up of the four investors as detailed by the Term Sheet, including Scharf. Pursuant to the agreement the Board of Directors was to have the power to set financial reporting requirements of PHM's operating companies, approve all new financing obligations, approve any future dealing with entities owned all or in part by members, and review all documents with NIPPN as a partner. Scharf has yet to be appointed as a member of PHM's Board of Directors with the powers outlined in the agreement as detailed by the Term Sheet. Instead, in direct contravention to these terms, a recent amendment to PHM's LLC Agreement removes a signification amount of power that the Board previously held and makes it member managed. This allows Defendant Mason and Defendant Ledgerwood to retain and exercise complete control of PHM.

83. PHM clearly and unequivocally repudiated the agreement as detailed in the Term Sheet when it failed and refused to make any required interest payments over the past eight months and failed to appoint Scharf and the other three investors as members of PHM's Board of Directors with the Board authorities articulated in the Term Sheet. Instead, Defendant Mason and Defendant Ledgerwood amended

PHM's LLC Agreement to make the Board member managed. This action thereby removed the Board's power as it was articulated in the Term Sheet, leaving the new Board with limited authority to make decisions for PHM. Defendant Mason and Defendant Ledgerwood then offered Scharf and the other investors a seat on the figurehead Board that directly contravened the agreement detailed in the Term Sheet.

84. PHM clearly and unequivocally repudiated the agreement as detailed in the Term Sheet when it only intended to perform on terms that did not align with the original obligations as detailed in the Term Sheet, such as electing a Board of Directors that had significantly less board authorities than outlined in the agreement in addition to other obligations.

85. PHM's breach of contract caused damage to Scharf in an amount to be determined at trial, but not less than his $1 million investment, plus the interest agreed to in the Term Sheet.

WHEREFORE, Scharf requests judgment be entered against PHM for its repudiation and breach of contract in an amount to be determined at trial but not less than $1 million plus the interest agreed to in the Term Sheet, in addition to pre and post judgment interest as allowed by law, attorneys fees and costs as allowed by law, and such other and further relief that the Court deems just and equitable.

**UNJUST ENRICHMENT**
**(Defendant PHM)**

86. Scharf incorporates the forgoing allegations as if fully restated herein.

87. In the alternative, if the Court finds there is no express agreement between Scharf and PHM, Scharf is still entitled to recovery through PHM's unjust enrichment of retaining Scharf's funds without compensating Scharf in any way.

88. Scharf conferred a benefit to PHM when he invested $1 million to PHM in exchange for interest payments, a seat on PHM's Board of Directors, and other obligations detailed in the Term Sheet.

89. PHM was enriched by Scharf's actions because PHM received $1 million in additional capital, but has yet to confer any benefit back to Scharf in exchange for these funds.

90. PHM knowingly accepted the benefit under circumstances that make it unjust for PHM to keep it without paying Scharf for its value. There are no circumstances that would indicate Scharf nor PHM would expect to receive a $1 million investment in exchange for nothing in return.

91. PHM has greatly benefitted from an additional $1 million in capital, while Scharf remains at a loss with no interest paid upon the investment and no access to his principal contribution.

92. Equity requires that Scharf receive restitution for PHM's actions. As it stands, Scharf is at a loss for his $1 million investment and PHM has made no indication that Scharf will be repaid or receive the interest he was promised.

WHEREFORE, Scharf requests judgment be entered against Defendant PHM in an amount to be determined at trial but in no event less than the return of his $1 million investment and promised accrued interest, pre and post judgment interest as

allowed by law, attorneys fees and costs as allowed by law, and such other and further relief as the Court deems just and equitable.

**Equitable Rescission**
**(Defendant PHM)**

93. Scharf incorporates the forgoing allegations as if fully restated herein.

94. PHM substantially breached its agreement with Scharf as detailed in the Term Sheet. PHM materially failed to perform its duties, such as making interest payments to Scharf.

95. Scharf is irreparably injured by PHM's repudiation of the agreement as detailed in the Term Sheet. PHM has failed to pay any interest on the preferred note and has not fulfilled material provisions of its obligations as set out in the agreement as detailed in the Term Sheet.

96. In the alternative where damages are not awarded, the agreement as detailed in the Term Sheet must be rescinded. PHM has substantially breached the agreement by failing to perform nearly all of its obligations. Failing to rescind the agreement would further harm Scharf because he still lacks access to his $1 million investment.

97. The status quo can be restored by returning Scharf's $1 million investment and rescinding the agreement as detailed in the Term Sheet between Scharf and PHM.

WHEREFORE, Scharf requests judgment against PHM and rescission of the agreement as detailed in the Term Sheet, resulting in the return of Scharf's $1 million investment plus unpaid interest under the Term Sheet, for interest to be awarded as

may be just and equitable, for attorneys' fees and costs as allowed by law, and for such other and further relief the Court deems just and equitable.

## IV. JURY DEMAND

Scharf requests a jury trial in Omaha, Nebraska.

Dated this 23rd day of October, 2024

ROBERT SCHARF, Plaintiff,

By: /s/Kenneth W. Hartman

Kenneth W. Hartman (NE# 21954)
of BAIRD HOLM LLP
1700 Farnam Street, Suite 1500
Omaha, NE 68102-2068
Phone: 402-344-0500
khartman@bairdholm.com